May it please the Court, my name is Mike Manning and my colleague Scott Randolph for the Appellant Cheryl Rowe. With the Court's permission, we're going to split our time. I'm prepared to address the Court's concern of whether an Article 3 case or controversy exists, and then I will sit down and let Mr. Rowe address the remaining arguments, and I will try to be cognizant of the time. This is an unusual case in that Ms. Rowe was actually awarded benefits but is the Appellant. In the normal situation, a case of controversy in a Social Security appeal would be the denial of benefits. That's not to say that Ms. Rowe hasn't suffered an actual injury in this case, as our contention is that she was wrongly adjudicated both at the agency level and at the district court level. And what's her injury that's cognizable in this court such that she has Article 3 standing? I think, first, the actual adjudication of a mental impairment when no doctor has ever actually diagnosed her with the impairment is an actual injury in and of itself, and also gives rise to potential injuries, not the least of which is the potential termination of her benefits. The ALJ's decision specifically notes that her condition is expected to improve with psychiatric treatment and recommends a medical review for potential reduction or termination of Ms. Rowe's benefits on that basis. Our contention is that she has been wrongly adjudicated with the mental impairment in the first place, and it's not supported by record evidence. And so she is faced with a situation where she could have a medical review in which a doctor determines she does not have a conversion disorder, which I think would be consistent with the doctors in the record who at most have diagnosed her with the possibility of a conversion disorder, and her benefits could be terminated based on the absence of a condition that she never had in the first place. I see. So that argument goes not merely to the collateral consequence with respect to her private insurance, but with respect to what might happen in the Social Security system. Okay. That's correct. And on that point, I'd cite the case to Holohan v. Masanari. The site is 246F3-1195, and it's a case out of this circuit in 2001. We have not submitted a 28-J letter on that point yet, but we will when we get back to our office. Okay. Our notice didn't go out to you, but just a few days ago. We understand that. Thursday afternoon. That was a case where the appeal involved, at least in part, a challenge to a notice which awarded benefits, and the claimant raised two due process challenges to that notice. The court analyzed the first challenge, analyzed whether or not there was a case of controversy on that first challenge and held that there was not. The second challenge was a challenge contesting the potential for the termination of benefits, and the court analyzed that issue on the merits, I think impliedly suggesting that there is a case for controversy and specifically noted in the case that the fact that the original notice found the claimant eligible for benefits would not itself preclude her from alleging an injury in fact. And with regard to the second challenge, the court also noted that the recipient's interest in continuing benefits after they've been awarded is great, and I think that that is precisely the case here. Okay. There are the additional real consequences that Your Honor alluded to with a private disability insurance and the stigma she might face, which are also threatened injuries based on the wrongful adjudication. We understand that the commissioner is prepared to address a Sixth Circuit case, arguing that a fully favorable decision is not appealable, and I think that our response to that would just be that this decision wasn't fully favorable because of the reasons I just discussed. Okay. If there's no more questions on that issue, I will let Mr. Randolph continue. Why don't we hear from your colleague at this time? Thank you. Thank you, Your Honor. Scott Randolph, appearing on behalf of the appellant, Ms. Rowe. The ALJ's finding at Step 2 is not supported by substantial evidence. The ALJ primarily relied on two sources, Dr. Gates and Dr. Anderson, to reach his finding at Step 2 that Ms. Rowe suffers from a severe medically determinable mental impairment. And individually or collectively, neither of those sources provide the substantial evidence that would be required to affirm at Step 2. First, with respect to Dr. Gates, Ms. Rowe visited Dr. Gates once in January of 2001, and at most twice, depending on the record, Your Honor. But isn't that enough? One visit is enough for a doctor to render an opinion. And, Your Honor, we would respectfully submit that Dr. Gates did not render an opinion at the conclusion of the January 2001 visit. Okay, but your point was that she saw him only once and maybe twice, but what difference does that make? And, Your Honor, correct, absolutely. But if Dr. Gates had actually made a diagnosis based on acceptable medical diagnostic techniques at the conclusion of that visit, and that was properly in the record, then that would be a basis to find substantial evidence. So your argument really is not regarding the number of visits, but what happened at those visits? Yes, Your Honor. And also with respect to the time frame of the visit was in 2001, and the ALJ's determination was in 2006 of January. So what difference does that make? Your Honor, I'd submit that the timing, particularly when you have Dr. Effley and Dr. Miller, the longstanding treating physicians that are documented in the record that document a severe vestibular impairment that's medically determinable, as opposed to a potential diagnosis, as the ALJ noted, of conversion disorder, that that wouldn't constitute the requisite substantial evidence to justify finding a step-up. What case authority do you have to support your argument that an opinion from a doctor that's more distant is less weighty? What case says that? Your Honor, I don't have a case on point for that. I think I would point, Your Honor, to 20 CFR 404-1508, that the opinion in the record must rely on acceptable medical diagnostic techniques, and we would submit that that did not happen with respect to Dr. Gates. And the ALJ noted that it was a possible diagnosis of conversion disorder, not a conversion disorder that was medically determinable. And I don't have a case, Your Honor, on the question precisely that you asked. With respect to Dr. Anderson, Ms. Rowe saw her again for one visit and recognizing that that's not controlling. After what she characterized as a brief interview, Dr. Anderson stated that she couldn't speculate on a possible conversion disorder and diagnosed only a rule-out conversion disorder. So what does that mean, if it's a rule-out conversion disorder? What does that mean in terms of the medical process? Right, Your Honor. That means that further testing would be required to rule it out or rule it in. And so at this point it's a possibility. Consistent with Dr. Gates, it's a possibility, but further testing would be required. And the ALJ, Your Honors, did not rely on Dr. Asher, who is the non-examining agency psychologist who appeared at the hearing. And just so that the record is clear, Dr. Asher merely mentioned that there was a possibility of conversion disorder he didn't speak to, that there was a diagnosis, such that that wouldn't constitute substantial evidence. As I look at the record in this case, the ALJ, based on substantial evidence, finds disability, but the cause is mysterious. I mean, everybody's having trouble with the cause. It may be physical, it may be mental, it may be a combination of the two, but I have trouble coming to the conclusion that the ALJ didn't have substantial evidence for making, I'll call it the guess, the guess that the ALJ made. I mean, what better guess could the ALJ have made based upon the ambiguous evidence? And, Your Honor, we'd submit that the ALJ wasn't in a position to diagnose from his position on the bench. There was no medical diagnosis of conversion disorder. There was a severe vestibular impairment that was diagnosed by at least two of Ms. Rose's treating physicians, and that provided a basis for finding, as he did, that she suffers from a severe vestibular impairment. But the problem with that diagnosis is that the symptoms were more severe than the diagnoses would indicate. We would disagree, Your Honor, with respect to particularly Dr. Epley, who is the world-renowned specialist. If the record is replete with evidence of his observations and consistent with at least over ten visits, he consistently diagnoses her with BPPV instead of somatoform disorder or finding a mental finding. And specifically on that point, Dr. Epley, in fact, noted a negative for psychiatric in his first evaluation, which, again, although not determinative, would be evidence that she does not, in fact, have that condition. Recognizing that I'm running low on time, we would submit that at Step 3, the ALJ failed to address or meaningfully document why or why not Ms. Rose's severe vestibular disorder did not meet or equal a listed impairment. There was testimony in the record that it did not meet a listed impairment, but there's no discussion in the ALJ's opinion as to why it did not equal the listed impairment. But didn't Dr. Epley express confusion regarding her resistance to treatment, that the normal treatments were not productive in her case, and that her symptoms were inconsistent with what's generally observed? I wouldn't agree with that, Your Honor, and specifically at 6-08 is the last record from Dr. Epley, SER 6-08, and Dr. Epley said that you obviously need to get this severe vestibular lithiasis resolved. And, Your Honor, recognizing that I'm about out of time, I'd like to reserve. Okay, you've got 10 seconds, but just so you don't sit down too anxious, we'll make sure you get a chance to respond. Thank you, Your Honor. Good morning. Nancy Micheletti for the Commissioner. This Court does not have jurisdiction to hear this case because no actual case or controversy exists here. Did you make that argument before we sent you a letter? No. Why not? I did not. Well, Your Honor, thinking back, of course, over these last few days as to why I didn't, I actually went back in and looked at my notes, and I believe that I did look at it, and what I did is I looked in the record, and I saw the Appeals Counsel letter, and it was the standard form letter, telling her that her request for review was denied and that she had the right to appeal the case, and she had to file the case in 60 days in the District Court. I realize that that letter does not confer jurisdiction upon this Court. However, at the same time, I was dealing with a pro se plaintiff with a mental impairment, and so I simply went forward. Well, I'm not asking because you waived an Article III defect, as you know, is not waivable. Correct, Your Honor. And, in fact, to show an actual case or controversy, Ms. Rowe has to demonstrate that, first, she suffered a concrete and particularized injury that's palpable. It has to be actual or imminent. The injury has to be fairly traceable to the unlawful conduct of the commissioner, and she has to show that it is likely that a favorable decision will redress that injury. What about the collateral consequences that were articulated by opposing counsel in terms of her disability insurance? Well, the agency doesn't, the ALJ is not supposed to consider insurance, private insurance. That is not. But can we consider that in terms of whether or not there has been an injury inflicted? No. Why not? Because the private, nowhere in, because there was no error on the part of the ALJ. Well, we have to get to jurisdiction before we decide whether or not there's an error. Exactly. So why can't we get there by looking at the collateral consequences? Because in the three elements that Ms. Rowe has to show, she also has to show unlawful conduct on the part of the commissioner. There is no unlawful conduct on the part of the commissioner. So you're ceding the collateral consequences would get us there if there were unlawful conduct? No, I'm not. No. The private insurance carrier is not a matter, it's not a factor that the ALJ can consider. We know that. We're asking you if we can consider the collateral consequences to determine if there's been an injury. No, the court can't consider hypotheticals. Okay, what? No, she's not saying it's a hypothetical. It's a fact that her insurance coverage under her disability insurance for mental illness lapses after a certain period of time. So that's not a hypothetical. That's a fact, at least the record as we have it. Well, Your Honor, I'm not sure that it's necessarily a proven fact. Well, it's not been disputed. It's what she has asserted. It's not been disputed. But what I'm saying is it doesn't matter. It doesn't matter. That is not something that this Court can consider. And what case authority do you have to support your argument that that's not a collateral consequence that we can consider in determining whether or not there's a case of controversy before us? Well, Your Honor, the controlling case law on case of controversy is Allen v. Wright, a Supreme Court case in Forney v. Apfel. In Forney v. Apfel, the Court said, a party who receives all that he has sought generally is not aggrieved by the judgment affording relief and cannot appeal from it. But she hasn't received all she sought. She wanted a determination that she was disabled not for mental reasons but for physical reasons. So ideally she would want a determination from the commissioner that she is physically disabled, not mentally disabled. I understand that that's what she would like. But Ms. Roe has pointed to no authority whatsoever. You know, there's a Supreme Court case that holds that a criminal conviction is not moot, even though the person who's been convicted has entirely served his time. And the reason it's not moot and that there's a continuing case of controversy is the collateral consequences arising out of the conviction, such as inability to vote and so on. Why is this case different? Well, first of all, this is different because there is no injury. I agree with Judge Rawlinson that there is an injury here. It's not an injury with respect to Social Security. There's a collateral consequence injury. That's what we're focusing on at the moment. There seems to be no dispute that she has a private insurance policy and that the private insurance policy is less favorable to her if her disability is traceable to a mental problem. Correct. And so if what the ALJ decided sticks and if the insurance company says, well, we're just going to take that diagnosis, that's a pretty severe adverse consequence. Your Honor, I would submit to the Court that Ms. Roe is asking this Court to assist her in committing a fraud on her insurance company. Because there is medical evidence. Well, but that depends on one's view of the merits of this case. That's correct, Your Honor. So I guess we have to get to the merits of this case to see whether we agree with you? No. I don't think the Court needs to get to the merits of the case. I believe that under Forney v. Abfell, Ms. Roe has a fully favorable decision. She applied for Title II benefits with an onset date of November 17th of 1999. The ALJ granted Title II benefits with an onset date of November 17th, 1999. She got all the relief she asked for. Yeah. And now you're accusing her of trying to commit a fraud? Well, I'm suggesting, Your Honor, that that would be the result. If this Court goes through and releases her. Fraud is different from mistake. Fraud is a pretty strong word. Your Honor, I'm suggesting, I'm not accusing Ms. Roe of committing fraud because Ms. Roe has a mental impairment. The ALJ found that she had a mental impairment. She firmly believes that she's disabled by the vestibular disorder when, in fact, the ALJ found that she was disabled by the combination of the vestibular disorder and the somatoform disorder. Let me ask you a question going back to your statement that there's no indication here that the ALJ committed an error. Is that right? That's one of your arguments that there's no case or controversy. Yes, Your Honor, that the ALJ's decision is supported by substantial evidence and free of legal error. Well, she contends that he erred in finding that she was disabled from a physical condition but also from a mental condition. Isn't that a proper claim of error on her part? It's a proper claim of error, but I would say to the Court, here it doesn't matter if the ALJ's decision is full of errors because the ultimate disability conclusion is that she's disabled. This Court has said... If that is a fully favorable decision, do you lose? If that is what this Court finds. If we find that the decision was not fully favorable, then you concede that you lose. I think that the Court cannot find that it is not a fully favorable decision, Your Honor. If we think otherwise, if we think we can find that, do you lose? Apparently I do. But, Your Honor, I don't... You're losing the Article 3 point. That doesn't get to the question of whether there is an error. Right. That gets us to the issue of whether or not there is substantial evidence to support the ALJ's decision. Correct. Now we're talking about the merits of the case. Right. With regard to the merits of the case, what I am telling the Court is it doesn't matter if there's any error. Mistakes that are irrelevant to the ALJ's ultimate disability conclusion. In this conclusion, he found her disabled. Can we actually get to the merits? That is to say, do you want to defend the ALJ's decision that this is mental rather than physical? I will. It sounds like you don't want to get there. You don't want to defend the ALJ's determination. If that's your position, that's fine. But it sounds to me like you're conceding that the ALJ erred in determining that there was a mental disability. No. Okay. You have a minute and 24 seconds to convince us why there's substantial evidence to support that. Substantial evidence to support the mental impairment, and I would say that the ALJ relied on all of the medical evidence in the record, not simply Dr. Anderson or an opinion by Dr. Gates. Dr. Anderson diagnosed a rule-out conversion disorder, she said. Okay. What does that mean? That's not a diagnosis. It's to rule out whether or not there's a mental disability. No, Dr. Anderson is saying, I believe there's a conversion disorder here and more testing would be needed to actually rule it out. Now, a rule-out disorder diagnosis is different from saying, I believe this is the problem. A rule-out diagnosis is, it's possible this is a problem and if we're going to get further down the road, we need to rule it out. Exactly. So it doesn't say, I believe there is this disorder. Did you mistake what Dr. Anderson wrote? Excuse me, did I mistake? Did you mistake what Dr. Anderson wrote when you said, Dr. Anderson said she believed that she had this disorder? Well, Your Honor, I got a rule-out from Jameson Research. Yeah, but not believe. It's not what Dr. – the ALJ has to consider the functional limitations. So it doesn't matter what we're going to call it. We can call it anything, but it's the functional limitations that the ALJ has to look at. And Dr. Anderson said, certainly at the very least, she experiences herself as being significantly disabled to the point where she cannot do any activities. And I see my time is up. You may continue, that's all right. No, we want to make sure we get this at least as best we can, right? Should I continue? Yes, please. Yeah, yeah. To the point where she cannot do any activities such as house cleaning, reading, working on the computer, et cetera, for any period of time without getting dizzy and nauseated. And clearly, if she were to be in a work situation and these symptoms were to show up, it would be impossible for her to function consistently and reliably in any type of job setting. The question is, what was the cause of the disability? No one knows at this point because one would have to go into treatment to find out what the cause. Well, if no one knows then, how can you say that the ALJ's decision that it was mental is supported by substantial evidence? It's... Your Honor, he took all this evidence and he weighed it in her favor. He found her... Well, kind of in her favor. More in her favor would have been that it was physical. But the objective findings did not add up to that. All of the objective findings... It was all across the board. There were objective findings that she had the disorder. Exactly. And the ALJ found that she had the disorder. However, it wasn't severe to the degree that she perceived the symptoms. Everyone, all of the experts in this, beginning with Dr. Hamill, testing results normal. Dr. Wong, mild vestibular dysfunction. Dr. Gates, all testing results normal. Even Dr. Epley, her symptoms and responses to maneuvers was inconsistent. But you would agree, wouldn't you, counsel, that there was no definitive diagnosis of a mental disorder? Oh, okay. I would agree. No diagnosis, but you don't need a diagnosis. There's evidence of a mental impairment and the ALJ had to consider that. He did everything right this time. Everything right. I'm in a very unusual position of coming in here and defending commissioners. I don't know if he did everything right. In a way, this is the flip side on the case of controversy. For reasons that I think we all quite well understand, Ms. Rowe does care the reason that the ALJ gave. The Social Security Administration doesn't care at all. The consequence for you is you pay. Correct. So why are you up here arguing this? Do you want me to talk about social stigma? I mean, there is no social stigma that attaches. No, no, I'm making a point. This is kind of a curious case because you're arguing a point as to which your client doesn't really care because your client pays one way or the other. In fact, I think you just said that. There's no question about why she is disabled. The only issue is the reason, and with respect to her entitlement to benefits from the Social Security Administration, the reason doesn't matter. So why are you fighting this so hard? Because substantial evidence supports the ALJ's decision. And there's no legal error. There's no legal error. And even if there is any error, it's harmless. It's harmless because the ultimate disability conclusion went in her favor. Okay, we got it. Thank you. Thank you very much. Would you like a minute to respond? Thank you, Your Honor. The position Ms. Rowe takes in this appeal is that you cannot excuse multiple legal errors just because of the ultimate award of disability benefits. The check at the end of the month is not the same for Ms. Rowe's purposes. She believes strongly that legal errors were created with respect to the finding of a severe mental impairment  Dr. Reed, a disabled person, and Ms. Rowe. Or Dr. Anderson, Dr. Gates, and Dr. Asher, if he would even be considered. And one no, Dr. Reed, who the ALJ ignored in reaching this finding. In response, we heard just a bit of an attack on Ms. Rowe's credibility for engaging in just basic life activities, which under this circuit's precedent is not permissible. Ms. Rowe testified that on good days she tries to do as much as she can. Well, you see, but that's not an issue. I mean, the ALJ found, and we're not arguing about that, that she's disabled. I mean, that's not the question. And our issue would be just on the residual functional capacity with respect to her ability to perform physical work, Your Honor. Okay. Thank you. Okay, thanks very much. Thank both sides for their arguments. The case of Rowe v. Asher is now submitted for decision.
judges: Alarcon, Fletcher W. , Rawlinson